**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN - 6 2006
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GearyEnergy, LLC, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 06-25 C |
| The United States, | ) | |
| Defendant. | ) | |

**COMPLAINT**

For its Complaint, plaintiff, GearyEnergy, LLC ("Geary"), alleges as follows:

**NATURE OF THE ACTION**

1. Geary is a small disadvantaged business that purchases and sells natural gas on both the wholesale and retail levels in the United States. Geary has been a supplier of natural gas to federal agencies for over three years. In September 2004, Geary entered into four firm fixed-price supply contracts with the General Services Administration ("GSA") for the provision of natural gas to various federal facilities.

2. This litigation seeks review of two Contracting Officer's final decisions: a November 17, 2005 decision terminating Geary for default on three of the four contracts Geary entered into with the GSA, and a December 8, 2005 decision assessing Geary with the costs of GSA's reprocurement of the services for which Geary was defaulted.

3. Due to Hurricanes Katrina and Rita, Geary's ability to carry out its obligations under its contracts was severely curtailed. However, each of Geary's contracts with the GSA contains a Force Majeure and an excusable delays clause

relieving Geary of liability for nonperformance in the event of an act of God. Geary was defaulted only after it invoked these Force Majeure and excusable delays clauses for three of its four contracts with the GSA.

4. Geary contends that the GSA's decision to terminate Geary for default breached GSA's contracts with Geary. In addition, in terminating the contracts for default, GSA breached its duty to cooperate and not to hinder Geary's performance of the contract. As a result, the terminations for default should be converted to terminations for convenience.

5. Further, in assessing reprocurement costs against Geary, GSA has failed to meet its burden of establishing: (1) that the reprocured supplies are the same as or similar to those involved in the termination; (2) that the GSA actually incurred excess costs; and (3) the GSA acted reasonably to minimize the excess costs resulting from the default.

**JURISDICTION**

6. The United States Court of Federal Claims has jurisdiction over this action pursuant to the Tucker Act, codified at 28 U.S.C. § 1491, and the Contract Disputes Act ("CDA") codified at 41 U.S.C. §§ 601-613.

**THE PARTIES**

7. Plaintiff, GearyEnergy, LLC, is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business in Tulsa, Oklahoma. Geary is a small, disadvantaged business concern.

8. Defendant is the United States of America acting principally through the General Services Administration.

9. The cognizant Contracting Officer for the contracts at issue is: Ms. Linda L. Collins, Contracting Officer, General Services Administration, Energy Center of Expertise (WPE), 301 7th St., SW, Room 4004, Washington, DC 20407-0001.

**FACTUAL ALLEGATIONS**

10. On August 2, August 3, August 25, and August 31, 2004, the GSA held a series of on-line reverse auctions in order to procure long-term contracts for the provision of natural gas to various federal facilities. All of the contracts that GSA sought to procure through these reverse auctions did not cover identical periods of time.

11. Through these on-line reverse auctions, GSA awarded Geary four contracts: GS-00P-04-BSC-0307, GS-00P-04-BSC-0326, GS-00P-04-BSC-0331, GS-00P-04-BSC-0337. The contracts, which were formally entered into in September 2004, were for the following federal facilities, at the following prices, with the following expiration dates:

| Facility | Contract No. | Price ($/[Dth]) | Expiration Date |
|---|---|---|---|
| GSA FDA – Steger Dr. | GS-00P-04-BSC-0307 | 7.160[1] | Aug. 31, 2006 |
| GSA Potter Stewart | GS-00P-04-BSC-0307 | 7.160 | Aug. 31, 2006 |
| NIOSH | GS-00P-04-BSC-0307 | 7.160 | Aug. 31, 2006 |
| Lexington BOP | GS-00P-04-BSC-0307 | 7.459 | Aug. 31, 2006 |
| VAMC – Leestown Road | GS-00P-04-BSC-0307 | 7.459 | Aug. 31, 2006 |
| VAMC – Cooper Dr. | GS-00P-04-BSC-0307 | 7.459 | Aug. 31, 2006 |
| Manchester FCI | GS-00P-04-BSC-0307 | 7.690 | Aug. 31, 2006 |

[1] Dth = 1 Dekatherm

| Facility | Contract No. | Price (S/[Dth]) | Expiration Date |
|---|---|---|---|
| Milan FCI | GS-00P-04-BSC-0307 | 6.853 | Aug. 31, 2006 |
| Iron Mountain VAMC | GS-00P-04-BSC-0307 | 6.820 | Sept. 30, 2006 |
| Battle Creek GSA | GS-00P-04-BSC-0307 | 6.990 | Sept. 30, 2006 |
| Dayton VAMC | GS-00P-04-BSC-0307 | 6.861 | Sept. 30, 2006 |
| GSA Traverwood | GS-00P-04-BSC-0307 | 6.787 | Aug. 31, 2006 |
| GSA Liberty | GS-00P-04-BSC-0307 | 6.787 | Aug. 31, 2006 |
| Florence FCI | GS-00P-04-BSC-0326 | 6.331 | Oct. 31, 2006 |
| Menlo Park VA | GS-00P-04-BSC-0331 | 7.990 | Nov. 30, 2006 |
| VA Northern California Healthcare | GS-00P-04-BSC-0331 | 7.010 | Nov. 30, 2006 |
| Seaside VA PA Healthcare | GS-00P-04-BSC-0331 | 7.990 | Nov. 30, 2006 |
| San Jose VA Outpatient | GS-00P-04-BSC-0331 | 7.990 | Nov. 30, 2006 |
| Waco VAMC | GS-00P-04-BSC-0337 | 6.380 | Oct. 31, 2005 |
| Temple VAMC | GS-00P-04-BSC-0337 | 6.380 | Oct. 31, 2005 |
| Marlin VAMC | GS-00P-04-BSC-0337 | 6.380 | Oct. 31, 2005 |
| Kerrville VAMC | GS-00P-04-BSC-0337 | 6.380 | Oct. 31, 2005 |
| Fort Worth BOP | GS-00P-04-BSC-0337 | 6.380 | Oct. 31, 2005 |
| Waco VAMC | GS-00P-04-BSC-0337 | 12.882 | Nov. 30, 2005 |
| Temple VAMC | GS-00P-04-BSC-0337 | 12.882 | Nov. 30, 2005 |
| Marlin VAMC | GS-00P-04-BSC-0337 | 12.882 | Nov. 30, 2005 |
| Kerrville VAMC | GS-00P-04-BSC-0337 | 12.882 | Nov. 30, 2005 |
| Fort Worth BOP | GS-00P-04-BSC-0337 | 12.882 | Nov. 30, 2005 |

| Facility | Contract No. | Price ($/[Dth]) | Expiration Date |
|---|---|---|---|
| Waco VAMC | GS-00P-04-BSC-0337 | 10.230 | Dec. 31, 2005 |
| Temple VAMC | GS-00P-04-BSC-0337 | 10.230 | Dec. 31, 2005 |
| Marlin VAMC | GS-00P-04-BSC-0337 | 10.230 | Dec. 31, 2005 |
| Kerrville VAMC | GS-00P-04-BSC-0337 | 10.230 | Dec. 31, 2005 |
| Fort Worth BOP | GS-00P-04-BSC-0337 | 10.230 | Dec. 31, 2005 |

12. Each of these contracts contained a Force Majeure clause. Clause A.23 of each of the contracts states:

> If either Party is rendered unable by Force Majeure to carry out, in whole or part, its obligations under this Agreement and such Party gives notice and full details of the event to the other Party as soon as practicable, then during the Force Majeure, but for no longer than 120 days in the aggregate during any 12 month period, the (any) obligations of the Claiming Party will be suspended. The parties expressly agree that upon the expiration of the 120 day period, Force Majeure will no longer apply to the obligations hereunder and both Parties will be obligated to perform. The Claiming Party will use commercially reasonable efforts to remedy the Force Majeure with reasonable dispatch.

13. Clause A.26 of the contracts defines a Force Majeure as "[e]vents not reasonably anticipated or within the control of the claiming Party such as, but not limited to, acts of God, acts of the public enemy, actions of governments or regulatory bodies, future changes in laws, rules, regulations or utility practices, or pipeline failure."

14. The contracts also incorporated FAR clause 52.212-4, which includes an excusable delay clause that states:

> The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or

> negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, flood, epidemics, quarantine restrictions, strikes, unusually sever weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

Clause 52.212-4(f).

15. Like many small businesses in the natural gas industry, Geary often faced difficulty obtaining financing for long-term fixed priced natural gas contracts with its suppliers, and as a result, Geary relied on medium to large firms to obtain supplies on its behalf.

16. For the specific contracts at issue here, Geary relied on United Energy Trading, with whom Geary entered into a long-term contract for the supply of natural gas in September 2002. United, in turn, purchased natural gas from WPS Energy. United committed to supply Geary with natural gas for the life of Geary's contracts with GSA.

17. On November 2, 2004, United informed Geary that United was terminating its contract with Geary. Although United attempted to terminate the contract by "mutual consent," Geary never agreed to the termination of the contract and never signed an acknowledgement of the termination. Nevertheless, United ceased supplying Geary under the contract.

18. As a result of United's unilateral termination, Geary began contracting directly with WPS for the purchase of natural gas. Due to Geary's size, WPS refused to provide natural gas to Geary under a long-term fixed price contract. Rather, WPS only

agreed to provide Geary natural gas at current market prices. Nevertheless, Geary continued to supply GSA at the prices in the contracts.

19. On August 29, 2005, Hurricane Katrina hit the Gulf Coast. On August 29, 2005, President Bush declared Louisiana, Mississippi, and Alabama federal disaster areas. On August 30, 2005, Secretary of Homeland Security Michael Chertoff declared Hurricane Katrina to be an "incident of national significance," thereby triggering the federal National Response Plan.

20. On September 24, 2005, Hurricane Rita made landfall in Texas. On that same day, President Bush declared Texas and Louisiana to be federal disaster areas due to the effects of Hurricane Rita.

21. Geary did not reasonably anticipate that two hurricanes, creating federal disaster areas across four states, would strike the Gulf Coast within one month of each other.

22. By early October 2005, roughly 75% of the natural gas production in the Gulf of Mexico remained shut-in in the Gulf due to the damage caused by the hurricanes.

23. As a result of the hurricanes, the Henry Hub (located in Erath, Louisiana), which is one of the most prominent natural gas supply centers and interconnects nine interstate and four intrastate pipelines, shut down and declared a force majeure. This also led the NYMEX exchange to suspend deliveries of future contracts of natural gas — the first time this had ever happened in the history of the NYMEX futures contracts.

24. One of Geary's primary suppliers of natural gas — KCS Resources -- produces natural gas from the Gulf region and utilizes pipelines connected to the Henry Hub to transport the natural gas. Geary relies on natural gas obtained from KCS

Resources to facilitate swaps of gas with WPS. Specifically, Geary would swap WPS a quantity of natural gas in the Gulf region that Geary received from KCS Resources with an identical quantity of WPS's natural gas in Michigan which WPS would, in turn, deliver to GSA facilities in Michigan. Thus, the closure of the Henry Hub due to the hurricanes affected the ability of Geary to perform the contracts at issue here.

25. In addition, after Hurricanes Katrina and Rita, the market price of natural gas rose significantly in a very short period of time. Reports from the Federal Energy Regulatory Commission ("FERC") indicate that prices for natural gas rose anywhere from 44 to 66 percent from the period immediately before the hurricanes to the period after the hurricanes. Moreover, the prices for natural gas rose over 100 percent from the prices in the previous year.

26. This price increase, which was directly related to the effects of the two hurricanes, placed Geary in a significant financial bind. Nevertheless, Geary continued to fulfill its obligations, while incurring significant financial losses under the contracts.

27. On October 19, 2005, WPS informed Geary that it would no longer conduct business with Geary due to the financial risk of selling natural gas to Geary at the post-hurricane inflated prices when Geary was only being paid for that natural gas by GSA at a substantially lower fixed price.

28. On October 26, 2005, Geary wrote the GSA requesting that the GSA modify Geary's contracts in order to relieve some of the burden Geary was confronting after the two hurricanes. Geary informed the GSA if the contracts could not be modified, Geary would have no option but to exercise the contracts' Force Majeure clause or declare bankruptcy.

29. Representatives from Geary and the GSA met on November 2, 2005 to discuss the impact of the natural disasters on natural gas supply and costs. The parties also discussed the possibility of modifying Geary's contracts with the GSA to allow Geary to continue to supply the GSA under an arrangement by which the GSA and Geary would share the increased natural gas costs resulting from the natural disasters.

30. On November 4, 2005, in a letter to the GSA, Geary proposed that its contracts be modified. Geary proposed a payment structure for the contracts for the period of November 1, 2005 to March 31, 2006, under which Geary would be reimbursed either on a cost-reimbursable basis based on an index of current market prices for each delivery point under the contract or on a fixed-price basis where the GSA would pay the current market price and Geary would reimburse the GSA the difference between the current market price that the GSA actually paid and the original agreed upon fixed-price in installments of $25,000 per month. Further, under the proposal, Geary and the GSA would negotiate a mutually agreed upon price term for the period of April 1, 2006 to the end of the respective contracts.

31. On November 8, 2005, the GSA wrote Geary rejecting the proposed modification of the contract. The GSA stated that such a modification was not in the best interests of the government and "would be inconsistent with how GSA has treated other similarly situated natural gas contractors faced with similar supply and market pricing difficulties."

32. The GSA's letter also requested that Geary provide the GSA, within three business days, "details regarding Geary's abilities and intentions regarding performance under the subject contracts for the remainder of their terms."

33. On November 14, 2005, Geary responded to the GSA's request, informing the GSA that due to the results of unforeseen acts of God (specifically, Hurricanes Katrina and Rita), Geary would be unable to continue to meet its obligations under Contracts GS-00P-04-BSC-0307, GS-00P-04-BSC-0326, and GS-00P-04-BSC-0331, and as a result, Geary was exercising its rights under the Force Majeure clause to suspend performance for 120 days. Geary also invoked the excusable delays clause.

34. In the same letter, Geary informed the GSA that Geary intended to continue performing Contract GS-00P-04-BSC-0337.

35. Rather than honor Geary's invocation of the Force Majeure and excusable delays clauses or negotiate with Geary concerning a way in which to continue performance, on November 17, 2005, the GSA terminated for default the three contracts for which Geary exercised the Force Majeure and excusable delays clauses.

36. Despite two presidential disaster declarations and the declaration of an incident of national significance by the Secretary of Homeland Security, the GSA did "not find evidence of force majeure or excusable delays."

37. In its termination letter, GSA states that "GSA repeatedly requested documented evidence from Geary supplier(s) for the Contract invoking curtailment and force majeure of natural gas supply due to Hurricanes Katrina and Rita." However, the GSA's November 8, 2005 letter makes no mention of the need for Geary to supply information regarding the curtailment of Geary's suppliers' supply of natural gas.

38. In addition, the GSA's termination letter states that "Geary did not take steps to protect itself from price fluctuations in the market." This is both incorrect and irrelevant. Geary's contracts with the GSA did not contain any contractual obligation for

Geary to hedge its supply of natural gas. Moreover, to the extent possible, Geary had entered into long-term supply contracts, but its supplier (United) terminated its contract with Geary and no other supplier was willing to enter into a similar long-term contract with a small, disadvantaged business such as Geary.

39. GSA's termination letter takes the position that Geary should be solely responsible for the supply and market disruptions caused by the natural disasters in the Gulf, and effectively reads the Force Majeure and excusable delays clauses out of the relevant contracts.

40. On December 8, 2005, GSA informed Geary that GSA was assessing Geary with $3,666,719.401 [sic] in reprocurement costs. Further, this amount supposedly represents only a portion of the GSA's reprocurement costs.

41. The GSA's December 8, 2005 letter provides Geary with no information concerning the reprocurement contracts. The letter is silent concerning how the GSA obtained the replacement services. For example, the letter makes no mention of whether the GSA procured the replacement services through full and open competition or through a sole source award. The letter does not mention what company is providing the reprocured services and at what cost. The letter also does not mention how much of the reprocurement costs are attributable to each contract, and the letter fails to substantiate whether the GSA has actually incurred the costs it now seeks to assess against Geary.

**COUNT I**
**(Breach of Contract)**

42. Geary incorporates each of the allegations in paragraphs 1 through 41 herein.

43. Each of the contracts for which Geary was terminated for default contains a Force Majeure clause (Clause A.23) and an excusable delays clause (FAR Clause 52.212-4(f)).

44. Due to the events of Hurricanes Katrina and Rita, there was an unanticipated and unforeseeable disruption in the supply of natural gas from the Gulf region, and as a result, there has been a significant (and unforeseeable) increase in the market price for natural gas.

45. Such events fell squarely within the type of risks covered by the Force Majeure clause and the excusable delays clause.

46. Nevertheless, despite two presidential disaster declarations and the declaration of an incident of national significance by the Secretary of Homeland Security, the GSA did "not find evidence of force majeure or excusable delays."

47. GSA's interpretation of the contracts effectively reads the Force Majeure and excusable delays clauses out of the relevant contracts.

48. By not honoring the Force Majeure clause in the contracts, and terminating Geary for default, the GSA breached each of the contracts.

49. By not honoring the excusable delays clause in the contracts, and terminating Geary for default, the GSA breached each of the contracts.

**COUNT II**
**(Breach of the Duty to Cooperate and Not Hinder Performance)**

50. Geary incorporates each of the allegations in paragraphs 1 through 49 herein.

51. There is in every government contract an implied duty on the part of the Government not to hinder the contractor in the performance of the contract and to cooperate with the contractor's performance.

52. Here, the GSA refused to abide by the Force Majeure and excusable delays clauses in the contracts at issue. Rather, the GSA terminated the contracts for default once Geary invoked the Force Majeure clause.

53. In terminating Geary for default, the GSA based its termination decision on the perceived failure of Geary to "protect itself from price fluctuations in the spot market" (in other words, Geary's failure to hedge). However, there was no contractual requirement that Geary hedge its contracts.

54. The GSA also refused to acknowledge that the natural disasters in the Gulf had any impact on natural gas supply and prices, and consequently refused to negotiate with Geary concerning potential modifications to the contract that would permit Geary to keep performing.

55. As a result of the GSA's action detailed in paragraphs 52 to 54 (both individually and in combination), the GSA breached the implied duty to cooperate with and not to hinder Geary's performance.

**COUNT III**
**(Failure To Prove Entitlement To Reprocurement Costs)**

56. Geary incorporates each of the allegations in paragraphs 1 through 55 herein.

57. On December 8, 2005, GSA informed Geary that GSA was assessing Geary with $3,666,719.401 [sic] in reprocurement costs.

58. Excess reprocurement costs may be imposed only when the Government meets its burden of persuasion that the following conditions are met: (1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default.

59. The GSA's December 8, 2005 letter fails to meet these standards. The letter is silent concerning how the GSA obtained the replacement services, whether the services are the same or similar to those involved in the termination, whether the Government actually incurred the costs, and whether the Government acted reasonably to minimize the excess costs.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff requests judgment as follows:

A. A judgment finding that the GSA breached its contracts with Geary, and as a result, the terminations for default must be converted to terminations for convenience, and the case should be remanded to the Contracting Officer for determination of Geary's termination for convenience damages;

B. A judgment finding that the GSA breached its implied duty not to hinder Geary's performance of the contracts and to cooperate with Geary's performance, and as a result, the terminations for default must be converted to terminations for convenience, and the case should be remanded to the Contracting Officer for determination of Geary's termination for convenience damages;

C. A judgment finding that Geary's nonperformance was excused by the doctrine of commercial impracticability, and as a result, the terminations for default must

be converted to terminations for convenience, and the case should be remanded to the Contracting Officer for determination of Geary's termination for convenience damages;

D. A judgment finding that the GSA has failed to establish its entitlement to reprocurement costs;

E. All of its damages and costs;

F. Attorneys' fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; and

G. Such other relief as the Court may deem just and proper.

Respectfully submitted.

Marcia G. Madsen

MARCIA G. MADSEN
DAVID F. DOWD
WILLIAM L. OLSEN
*Mayer, Brown, Rowe & Maw LLP*
*1909 K Street, N.W.*
*Washington, D.C. 20006*
*(202) 263-3274 (Phone)*
*(202) 263-5274 (Fax)*

*Attorneys for GearyEnergy, LLC*

January 6, 2006

MAYER BROWN ROWE & MAW

Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101

Main Tel (202) 263-3000
Main Fax (202) 263-3300
www.mayerbrownrowe.com

**William L. Olsen**
Direct Tel (202) 263-3221
Direct Fax (202) 263-5221
wolsen@mayerbrownrowe.com

January 6, 2006

Brian Bishop, Clerk
United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005

Re: *GearyEnergy, LLC v. United States*, No. __

Dear Mr. Bishop:

Enclosed in connection with the above-referenced action, please find the following documents:

(i) Complaint;

(ii) A check for the filing fee;

(iii) A Cover Sheet for the Complaint; and

(iv) Plaintiff's Rule 7.1 Corporate Disclosure Statement;

If you have any questions, please do not hesitate to contact me at 202-263-3221.

Sincerely,

William L. Olsen

Enclosures

ORIGINAL